RANDY S. GROSSMAN
United States Attorney
NICOLE E. BREDARIOL
MA Bar: 696484
Special Assistant U.S. Attorney
U.S. Attorney's Office
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-8419
Email: Nicole.Bredariol@usdoj.gov

Attorneys for the United States

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JUAN CARLOS BARRANTES (1);<br>JESUS ADOLFO ARGUETA VARGAS (2);<br>HECTOR PEREIRA JIMENEZ (3);<br>LUIS ADOLFO MARTINES  VALLADORES (4);<br>ARLEY VILLAGRA RAMIREZ (5);<br><br>Defendants. | Case No.: 20-CR-0763- CAB<br><br>**UNITED STATES' OMNIBUS SENTENCING MEMORANDUM AS TO DEFENDANTS**<br><br>Date: March 30, 2022<br>Time: 9:30 a.m. |

The UNITED STATES OF AMERICA, by and through its counsel, Randy S. Grossman, United States Attorney, and Nicole E. Bredariol, Special Assistant United States Attorney, hereby files its Sentencing Memorandum as to all Defendants. This memorandum is based upon the files and records of the case.

**I.    INTRODUCTION**

Defendant 1: Juan Carlos Barrantes (BARRANTES), Defendant 2: Jesus Adolfo Argueta Vargas (ARGUETA VARGAS), Defendant 3: Hector Pereira Jimenez (JIMENEZ), Defendant 4: Luis Adolfo Martines Valladores (MARTINES VALLADORES), and Defendant 5: Arley Villagra Ramirez (VILLAGRA RAMIREZ), (collectively "Defendants") are before the Court for sentencing after pleading guilty to

Possession of Cocaine with Intent to Distribute on Board a Vessel in violation of 46 U.S.C. § 70503. A substantial sentence is warranted here. Maritime cocaine smuggling is complicated. The skill necessary for a crew of five men to transport cocaine on the high seas takes skill and experience. Engaging in a journey that will take days and requires navigating hundreds of miles on the ocean takes extensive preparation. Defendants relied on each other during this extended journey and worked together, utilizing their skill and acumen to try and achieve a significant reward – a payday. When discovered by law enforcement, Defendants fled at a high rate of speed and jettisoned the cocaine into the ocean to evade being stopped. Committed to their flight, Defendants failed to stop after warning shots and only stopped when the Coast Guard shot out their outboard engines. After taking into consideration the seriousness of the offense, including the level of skill and preparation required to transport approximately 500 kilograms of cocaine, and the remaining 3553(a) factors, the United States recommends 96 months' custody followed by 5 years' supervised release, no fine, and a $100 special assessment.

## II. STATEMENT OF FACTS

On February 7, 2020, a Maritime Patrol Aircraft ("MPA") detected three targets of interest conducting a rendezvous approximately 150 nautical miles ("NMs") South of the Costa Rica/Panama border, in international waters. The MPA then observed two of the targets get underway, heading North at a high rate of speed. United States Coast Guard Cutter ("USCGC") TAHOMA was nearby and diverted to intercept the two targets.[1] TAHOMA launched its over the horizon boat ("OTH") with a boarding team and a Coast Guard helicopter to interdict the two go fast vessels ("GFV's"). The helicopter arrived on scene with the GFV and observed that it had five defendants on board, was blue in color with a center console, a bimini covering, and two outboard engines.

---

[1] The Coast Guard was also able to interdict the second northbound GFV. This vessel was grey in color, did not have a Bimini covering, and only had two persons onboard. The Coast Guard conducted a law enforcement boarding of this vessel, but no drugs were discovered and both the GFV and two persons onboard were ultimately released.



***The GFV Crew Jettisons Packages of Contraband then Flees the Scene***

As the helicopter came closer to the GFV it observed the Defendants jettison packages consistent with contraband over the side of the GFV and into the water. Defendants on the port and starboard side of the GFV began throwing multiple packages of cocaine over the side and the Defendants continued to flee. At this location the Coast Guard later recovered approximately 17 packages of cocaine weighing over 500 kilograms.





***Coast Guard Helicopter Had to Use Disabling Fire Twice to get the GFV Crew to Stop***

The Coast Guard Helicopter pursued the fleeing Defendants and energized its blue law enforcement light and ordered the Defendants to stop in both English and Spanish. The Defendants continued to flee. The helicopter then fired warning shots, which the Defendants ignored and continued to flee at a high rate of speed. The helicopter moved alongside the GFV and implemented disabling fire, shooting out the port engine of the GFV. At this point the Defendants began making erratic turns, attempting to evade the helicopter.

The helicopter again energized its blue law enforcement light and ordered the Defendants to stop in English and Spanish. The Defendants continued to flee, so the helicopter fired a second round of warning shots in front of the GFV. Ignoring this signal, the Defendants continued to flee at a high right of speed. The helicopter again tried disabling fire, shooting out the only remaining engine and finally forcing the Defendants to come to a stop.



### The U.S. Coast Guard Gains Control of the GFV and Conducts a Boarding

Once the GFV was stopped, the Coast Guard conducted a Right of Visit boarding and identified the five defendants in this case as the five people onboard the GFV. None of the Defendants claimed to be the master of the vessel, but D1, BARRANTES, made a claim of Costa Rican nationality for the vessel. The Coast Guard enacted the United States/ Costa Rican Bilateral Agreement and sent Costa Rica an "Action Request Regarding Vessel Suspected of Illicit Traffic." Costa Rica could neither confirm nor deny the nationality of the GFV, so it was treated as without nationality and subject to U.S. jurisdiction. The Coast Guard did not find any additional packages of cocaine on the GFV.

### Jettisoned Packages Were Recovered and Determined to be Cocaine

A Coast Guard boarding team recovered approximately 17 packages from the jettison field. The wrapping on these packages matched that seen in the videos of the jettisoned packages. The packages had an at sea weight of 340 kilograms and a final DEA lab weight of 502 kilograms of cocaine.



Post-Arrest the Defendants provided various statements. Ultimately, agents discovered Defendants BARRANTES and PEREIRA JIMENEZ traveled from Costa Rica to transport drugs on a drug laden vessel. During their journey, their vessel took on water and they were left floating with bales of cocaine and had to call for assistance. Defendants ARGUETA VARGAS and VILLAGRA RAMIREZ departed on one GFV to rendezvous with BARRANTES and PEREIRA and recover the cocaine and then continue the journey

to Costa Rica. MARTINES VALLADORES arrived on a third GFV a few hours later to also assist. BARRANTES, PEREIRA JIMENEZ, and MARTINES VALLADORES all joined ARGUETA VARGAS and VILLAGRA RAMIREZ on their GFV with all the cocaine and continued on their journey to Costa Rica, when they were interdicted by the Coast Guard.

**B. Defendants Statements**

During his presentence interview BARRANTES stipulated to the factual basis of the plea agreement.

During his post arrest statement ARGUETA VARGAS admitted to knowingly transporting cocaine for money. He stated this was his third drug smuggling run and that he embarked on a GFV and picked up VILLAGRA from the beach. ARGUETA was provided with coordinates of where he was supposed to pick up the drugs. At that location, he saw PEREIRA JIMENEZ and BARRANTES floating in the ocean with bales of cocaine. ARGUETA understood that PEREIRA JIMENEZ and BARRANTES were on a drug laden vessel that sank. PEREIRA JIMENEZ and BARRANTES and the cocaine were recovered onto the GFV with ARGUETA and VARGAS. Then a third GFV arrived with MARTINES VALLADORES and other unindicted co-conspirators. MARTINES VALLADORES then got onto the GFV with the other co-defendants which was ultimately interdicted by the Coast Guard. ARGUETA stated that he had completed two prior drug smuggling runs on GFVs and that he was paid approximately $10,000 and $3,000 for the previous drug trafficking runs, depending on the distance he traveled rather than the amount of drugs he transported. His first run involved approximately 400 kilograms of cocaine, and his second run involved approximately 600 kilograms of cocaine and 500 kilograms of marijuana. He stated he completed both prior drug trafficking runs out of financial necessity.

During his presentence interview ARGUETA VARGAS adopted the factual basis of the plea agreement. He stated he committed the instant offense out of financial need.

During his presentence interview PEREIRA JIMENEZ stipulated to the factual basis of the plea agreement. He explained he committed the instant offense because he wanted to help his family financially.

During his post-arrest interview MARTINES VALLADORES claimed that he left home to go fishing and then was diverted to help PEREIRA JIMENEZ and BARRANTES whose boat was sinking. The remaining defendants departed from Golfito the next day and after rescuing PEREIRA JIMENEZ and BARRANTES they later came across bales of cocaine floating in the ocean. It was ultimately determined that this was not truthful, and the sequence of events actually followed the general scheme outlined above.

During his presentence interview MARTINES VALLADORES admitted that he was offered $8,000 to go find men who got lost doing something illegal with drugs. He found PEREIRA JIMENEZ and BARRANTES and the cocaine and loaded it onto a vessel. He said that they were traveling with the cocaine headed for Costa Rica for approximately three hours before they were interdicted by the Coast Guard. He claimed that BARRANTES was giving one of the co-defendants instructions during the flight from the Coast Guard.

During his post-arrest interview VILLAGRA RAMIREZ stated that he left home to look for a missing fisherman. He said he had no knowledge of the drugs onboard, despite being questioned about throwing bales of cocaine overboard while fleeing from the Coast Guard. It was ultimately determined that this was not truthful, and the sequence of events actually followed the general scheme outlined above.

During his presentence interview VILLAGRA RAMIREZ stipulated to the factual basis of the plea agreement. He also explained that he is known in his town as an experienced fisherman and he received a phone call from a person he knew was involved in smuggling drugs about finding missing fishermen who were supposed to be moving drugs. VILLAGRA RAMIREZ was asked to go find the missing drug traffickers and their load of drugs and to bring it back to Costa Rica in exchange for monetary payment.

While VILLAGRA RAMIREZ was not told the exact amount of the payment it was communicated to him that it would be enough to be worth his time. He agreed to participate for financial gain.

### III. THE GUIDELINES

#### A. Calculation

Under USSG § 2D1.1 (c)(1), the base offense level is 36.[2] The United States is not recommending any enhancements nor any reductions for role. The United States is recommending a two-level enhancement for reckless endangerment during flight based on fleeing from the Coast Guard. There is a two-level downward departure for safety valve, a two-level downward departure for combination of circumstances, and a three-level downward departure for acceptance of responsibility. Defendant is in Criminal History Category I. The resulting guideline range is 108 to 135 months in custody. Pursuant to the plea agreement the United States is recommending 96 months in custody for each Defendant – a variance of 12 months below the low-end of the guideline range.

#### B. Government Recommendation

Several factors justify the Government's recommendation. First, Defendant pled guilty to Possession of Cocaine with Intent to Distribute on Board a Vessel. Maritime drug smuggling is a complicated endeavor. The evidence demonstrates the defendants coordinated an at sea voyage spanning hundreds of nautical miles to transport a vast amount of cocaine valued at millions of dollars. Transporting cocaine on the high seas takes considerable skill and experience. That skill promised a significant reward. For Defendants that reward was monetary.

---

[2] Per the DEA lab report, a total of 502 kilograms of cocaine were recovered from the jettison field. However, initially it was reported that only 340 kilograms of cocaine were recovered. Accordingly, the United States offered a plea agreement with a base offense level based on the initial report of the amount of cocaine recovered. Consistent with the plea agreement, the United States is recommending a base offense level of 36.

Second, in this case Defendants took every effort to evade law enforcement and spoliate potential evidence. They failed to stop when the Coast Guard approached, fled for an extended period of time at a high rate of speed, executed erratic turns, and jettisoned bales of cocaine. Through the choices Defendants made to flee from law enforcement, erratic maneuvers, and jettison the cocaine, they recklessly created a substantial risk of death or bodily injury both to themselves, and to the Coast Guard officers who were pursuing them. But for the skill, training, and acumen of the Coast Guard the defendants very well could have caused serios injury during their flight which resulted in the need to use both warning shots and disabling fire, and they might have successfully evaded prosecution.

The United States is recommending a two-level increase pursuant to §3C1.2 since the Defendants recklessly created a substantial risk of death or serious bodily injury to another person while fleeing from law enforcement. As discussed, Defendants fled from the U.S. Coast Guard helicopter for an extended period of time, traveled at a high rate of speed, and executed erratic turns. In order to halt their flight, the helicopter had to expend two series of warning shots and two series of disabling fire. The Defendants did not cease their attempt to flee until the disabling fire rendered both engines of their GFV inoperable, namely until they were forced to stop. The Defendants' actions created a substantial risk to both themselves and to members of the U.S. Coast Guard.

Third, this was a complicated smuggling venture for which Defendants' preparation, expertise, experience, and efforts were critical. Each acted as more than a mere drug courier which this district often encounters for sentencing in land-based drug smuggling ventures. Maritime smuggling requires specialized skills, and men like Defendants are recruited because of their familiarity with the maritime environment. That required skill is evident in this case, where Defendants were discovered hundreds of miles from their home countries. Arriving to the interdiction location, over 150 NM from the Costa Rica/Panama border, required each to prepare to be away from home for an extended period of time, to help navigate the vessel over a multi-day journey spanning hundreds of miles, and

complete a complicated at sea vessel rendezvous. Over this extended time each was required to deal with all the difficulties that navigating on the high seas brings, including weather, sea state, and difficult communications. This requires expertise and experience and cannot be performed by just anyone. Unlike a simple drug courier who may only be responsible for drugs for a few hours and a few miles during a border crossing, this journey required Defendants to be responsible for the cocaine for hundreds of miles and days.

Fourth, the United States does not believe an adjustment for role, either aggravating or mitigating, is appropriate in this case. The United States is not arguing for a navigator enhancement. Defendants took turns navigating and driving the GFV. Defendants operated as a team, utilizing tremendous skill, training, and acumen as discussed. All five were literally stuck in the same small boat, and equally culpable. Each Defendant is not less culpable than the average participant—let alone *substantially* less culpable. Defendants also understood the scope of this crime, each was to transport cocaine- either by picking up the cocaine, or rendezvousing with a vessel which had cocaine, transfer it to another vessel, and transport it back to Costa Rica. Defendants were involved in planning for and preparing for the criminal activity. As one of five men on this vessel in the middle of the high seas each was in control of the vessel. Finally, Defendants stood to benefit from the criminal activity, and engaged in this crime for financial reasons.

Fifth, Defendants were responsible for trafficking an astounding amount of cocaine – 500 kilograms. While Defendants may claim each did not intend to come to the United States, the role in transporting the cocaine in the GFV was critical to the success of the trafficking venture and it was foreseeable the cocaine was bound for the United States. During a maritime drug smuggling venture the value of the drugs, and potential profit, increases exponentially. Had this cocaine successfully made it to the United States it would have been worth tens of millions of dollars. There is no doubt that had this highly dangerous drug successfully made it to the United States it could have led to extensive harm.

Sixth, given the need to generally deter others, it is essential the sentence reflects the seriousness of this offense and the potential harm from trafficking cocaine on the high seas.

Only a significant sentence will discourage future potential traffickers from engaging in similar crimes. The incentive to make relatively large sums of money for trafficking drugs must be combated with the deterrence of significant sentences for engaging in this criminal activity. This is highlighted by Defendants explanation that the motive to participate in the instant offense was monetary. There is a need to impose a sentence that adequately deters others from engaging in this criminal activity for the hopes of financial reward.

Seventh, this is a case that had substantial pretrial litigation. It involved multiple rounds of motions, two motions hearings, discussion about foreign depositions, classified information, and other litigation. Although there is some cost and time saving to the United States by the defendants accepting responsibility and pleading guilty before proceeding to trial, this is not a case where there were significant savings for the United States.

Eighth, the variance already recommended by the United States appropriately accounts for any variances based on the history and characteristics of the defendant or COVID-19. Defendants were entrusted to smuggle approximately 500 kg of cocaine hundreds of miles while operating far from land with some autonomy. When discovered by law enforcement, they chose to flee and did everything they could to evade capture with erratic maneuvers, jettisoning the cocaine, and placing both themselves and law enforcement in danger. Their sentence should reflect their extensive culpability.

**C.     Conclusion**

Based on the 3553(a) factors a custodial sentence of 96 months, followed by 5 years' supervised release, no fine, and a $100 special assessment is appropriate for each of the Defendants.

DATED: March 22, 2022

Respectfully submitted,

RANDY S. GROSSMAN
United States Attorney

*/s/ Nicole E. Bredariol*
Nicole E. Bredariol
Special Assistant U.S. Attorney